Helen B. ELLIOTT, Individually and as Administratrix of the Estate of Darlene Julie Elliott, Appellant,

v.

MICHAEL JAMES, INC., t/a Gentlemen II, Appellee.

Helen B. ELLIOTT, Individually and as Administratrix of the Estate of Darlene Julie Elliott, Appellee,

v.

MICHAEL JAMES, INC., t/a Gentlemen II, Appellant.

Nos. 76–1132, 76–1134.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 18, 1976.

Decided May 6, 1977.

Rehearing Denied June 9, 1977.

Roger E. Warin, Washington, D. C., with whom Laidler B. Mackall, Washington, D. C., was on the brief for appellant in No. 76–1132 and appellee in No. 76–1134.

William D. Foote, Jr., Washington, D. C., with whom James C. Gregg, Washington,

D. C., was on the brief for appellee in No. 76–1132 and appellant in No. 76–1134.

Before: DANAHER, Senior Circuit Judge, and McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge Danaher.

Opinion filed by Circuit Judge McGowan, concurring in part and dissenting in part.

DANAHER, Senior Circuit Judge:

Darlene Julie Elliott, aged 20, was stabbed to death in the early morning hours of June 24, 1968, while in the centrally located Washington restaurant known as Gentlemen II owned by Michael James, Inc. Her mother, Helen B. Elliott, as administratix of Darlene's estate, (and hereinafter referred to as Plaintiff) commenced an action seeking damages, her claim in a first count being predicated upon the District's Wrongful Death Statute,[1] with a second count based upon the District's Survival Statute.[2] The district court rejected Plaintiff's wrongful death claim but allowed the survival claim to go to the jury which returned a Plaintiff's verdict in the amount of $7,524.91.[3]

1. The District's Wrongful Death Statute, 16 D.C.Code § 2701, as here pertinent may be paraphrased thus:

When, by an injury done or happening . . . the death of a person is caused by the wrongful act, neglect, . . . of a person or corporation, and the act, neglect, . . . is such as will, if death does not ensue, entitle the person injured . . . to maintain an action and recover damages, the person who or corporation that is liable if death does not ensue is liable to an action for damages for the death, notwithstanding the death of the person injured, even though the death is caused under circumstances that constitute a felony.

The damages shall be assessed with reference to that injury . . . to the next of kin of the deceased person [here, Helen B. Elliott, the victim's mother]. Such damages shall include funeral expenses. [The pertinent section importantly provides further that if in a particular case, the verdict is deemed excessive the trial judge or this court on appeal of the cause may order a reduction of the verdict].

2. The District's Survival Statute, 12 D.C.Code § 101, as here pertinent may be paraphrased:

On the death of a person in whose favor . . . a right of action has accrued for any cause prior to his death, the right of action survives in favor of . . . the legal representative of the deceased. In tort actions for personal injuries, the right of action is limited to damages for physical injury, excluding pain and suffering resulting therefrom.

[We have held specifically that if a tort causes death, two interests have been invaded as explained by Judge Fahy in *Runyon v. District of Columbia*, 150 U.S.App.D.C. 228, 463 F.2d 1319 (1972). Our opinion there further prescribes the factors upon which proper recovery is to be permitted for each claimant or class entitled to damages under the respectively applicable sections, *supra*].

3. Defendant, Michael James, Inc., has asked us to affirm the judgment entered in the District Court, representing to us that the jury had been properly instructed as to the issue of damages on the survival count, and, in effect, that no more is required. Defendant than adds that if we do no more than affirm the judgment

## BACKGROUND

This case was previously before us on Plaintiff's appeal from a judgment in favor of Defendant following a bench trial. Our opinion[4] sets forth facts developed at the first trial which are substantially the same as those appearing from the record of the jury trial now under review. Our earlier opinion had identified the case as a "wrongful death action,"[5] where we remanded for a new trial since we found ourselves "not satisfied that the trial judge gave effect to inferences reasonably to be drawn from the plaintiff's case."[6] Accordingly we concluded, the judgment of the District Court must be reversed and the case was remanded for a new trial.

Plaintiff here has sought reversal of the ruling by the district judge dismissing the wrongful death claim. Defendant has contended that the trial judge erred in failing to grant Defendant's motion for a directed verdict in its favor and for judgment N.O.V.

Perhaps the more readily to pose the issues to be discussed, we should briefly turn to the facts and thereupon, to Defendant's claims of error.

In the late afternoon on Sunday, June 23, 1968, Darlene Elliott and a companion arrived at the Gentlemen II for refreshments. That evening the restaurant-bar closed at midnight whereupon the doors were closed and locked to the public. Paul Fleischer was the night manager whose duties after the closing included clearing the cash registers, checking the premises, filling out receipt books and preparing the bar for the next day's operation.

Darlene Elliott had been employed by the Defendant to work in the Defendant's soon to be opened Baltimore restaurant but meanwhile she was serving in Washington as a trainee bookkeeper at a wage of $85 per week. She had remained after other employees left for night manager Fleischer had asked her to remain to drive him to his home.

After other employees had left between 12:30 and 1 a. m. there remained only Fleischer, Darlene Elliott and Stanley Cobb, a night bus boy and clean-up man. The doors had been locked but could be opened with a key which was in the possession of Fleischer.[7] Respective counsel had stipulated as to the foregoing and to various following facts as to which no proof would be deemed necessary.

For example, one of the 18th Street exits was not regularly used, indeed it was secured by padlocks and bolts with restaurant equipment piled against it. The other 18th Street exit was secured with a hasp, padlock and a crossbar, utilized by day for delivery of dry goods and liquor and by the help, but it was always secured at night.

limiting Plaintiff's recovery to $7,524.91, Defendant would not further seek consideration of the points raised on Defendant's cross-appeal.

4. *Elliott v. Michael James, Inc.,* 165 U.S.App. D.C. 356, 507 F.2d 1179 (1974).

5. *Id.* Our opinion then upon the first appeal made no specific reference to the survival claim, but we now have under consideration the same complaint based upon the same counts.

6. *Id.,* 165 U.S.App.D.C. at 358, 507 F.2d at 1186. Our opinion importantly had noted the District of Columbia Building Code § 3–643(j) as applicable to the premises of Gentlemen II:
   *All doors* used in connection with means of egress *shall be so arranged as to be always readily opened* from the side from which egress is made. *Locks, where allowed, shall not require a key to unlock from the inside.* (Emphasis supplied).

7. There would seem to be no question but that keeping the premises locked and under the control of Defendant's night manager was designed to further the purposes of Defendant. Apparently, the owners did not trust the night clean-up man to have access to the liquor supply. Even to open the double doors of the restaurant would require pulling two levers, one at the top and one at the bottom of a door whereupon the double doors could be opened outward. Called as a witness by Plaintiff, one of the co-owners explained that in any event, Darlene Elliott might have gained egress if she had picked up a metal stool and had broken a glass panel in one of the doors. It could be that the jury was not impressed that a terrified girl struggling for her life against the stabbing Cobb would or could have sensed any such possibility.

There was no exit from the basement, none from the mezzanine, and there were no outside windows opening therefrom. Windows on the first floor, the main floor of the restaurant, were plate glass and could not be opened. Windows on the third floor of the premises were three stories above the ground, and the basement windows gave onto barred-in window wells below the surface of the street. Upon conclusion of the reading to the jury of the stipulation, Plaintiff rested her case. Defendant renewed its earlier motions which the trial judge denied. He then informed the jury that the defense relied "in substantial extent on some of the same evidence you have already heard." However, Defendant "has the opportunity to present any additional facts which they wish to present to your attention."

Thereupon Defendant called as its witness one of the co-owners of Gentlemen II who testified that Mr. Fleischer was approximately 5 feet, 8 inches tall, weighing about 140 to 145 pounds, slightly built but not what would be considered an athletic type. Stanley Cobb was described as approximately 6 feet tall, muscular, well built, energetic, and considered to be in excellent health. Upon the conclusion of the testimony of that witness, Desmond, Defendant, rested his case but renewed Defendant's motions for a directed verdict which the trial judge denied.

The record makes clear that of prime importance, both at the first trial and again at the second trial, was a provision of the District of Columbia Building Code § 3–643(j) as applicable to the premises of the restaurant-bar. That section reads:

> All doors used in connection with means of egress *shall be so arranged as to be always readily opened* from the side from which egress is made. *Locks, where allowed, shall not require a key to unlock from the inside.* (Emphasis supplied).

The condition of the premises within the purview of that code section remained unchanged throughout the gruesome happenings of those early morning hours. Fleischer was stabbed to death in the basement. On the main floor, Darlene Elliott as the jury clearly could find, had struggled throughout her vain efforts to reach the only exit, the key to which was in the possession of Fleischer. The victim's bra and other items of underclothing were found in various locations on the main floor. There were bloodstains here and there, even reaching as far as a coat rack near the locked exit. Darlene Elliott was stabbed many times during her struggle. The young woman was alive at least up to 3 a.m. on the morning of June 24, 1968, it fairly may be concluded, for a United States Park Police Officer then passing Gentlemen II heard a scream which he took to be that of a woman. He stopped and listened but heard nothing further.

Ultimately police had been alerted by a call from the telephone company. The premises were completely locked, and police had to break into the restaurant to gain access. There was no evidence that any persons except the three employees were or had been in that restaurant. Cobb was the only one alive.[8] We have said enough to indicate that Darlene Elliott in a long drawn-out struggle had fought vainly with Cobb in an effort to save her life. Cobb did not testify at his own trial,[9] nor was he a witness at either the first or the second trial of this case.

Such is the background posing the issues before us.

---

[8] We have affirmed Cobb's conviction on two counts of second-degree murder, *United States v. Cobb,* 146 U.S.App.D.C. 69, 449 F.2d 1145 (1971). We then noted that Cobb had called the telephone company to say that he had been injured by four intruders, following which call police were notified and responded to the scene. In addition to the bodies of Darlene Elliott and the night manager, Fleischer, the police found Cobb lying on the floor suffering apparently from knife wounds. He said that four men had come into the restaurant and attacked the three employees. An extensive police investigation included a complete search of the building, but the officers were unable to find any indication that there had been anyone in the premises except the three employees.

[9] *Id.*

## ISSUES

Fully alerted to the claims of the parties, quite aware of our holding on the first appeal in *Elliott v. Michael James, Inc., supra* n. 4, with the foregoing facts freshly in mind, the trial judge took account of the importance of the violation of the building code regulation, *supra*. In colloquy with respective counsel the judge noted, *First*

on the basis of the remand . . . that there is a prima facie case created by a demonstration of violation of the regulation, inasmuch as Darlene Elliott was found by the Court of Appeals to be among the class of people to be protected by the regulation,

and *Second,* he went on to rule that he did not see a "wrongful death case here" but that there was a "survival action." Concluding that the damages on the claim for wrongful death were "entirely speculative," the judge worked out with counsel for the respective parties an agreement that funeral expenses might be taken into account in the award for damages on the survival claim *"if there is an award."* (Emphasis added).

He heard argument by counsel for Plaintiff that the wrongful death claim should be submitted to the jury, but reiterated his conclusion that the evidence was inadequate to justify an award of damages for wrongful death. Our discussion, *infra,* will reach that point in due course. For the present, we will deal only with Defendant's cross-appeal as we treat of Defendant's claims of error. We so order our discussion since, as may seem apparent, unless liability be established we need not reach Plaintiff's claim respecting a recovery of damages for wrongful death.

## PART I

### A

■ Defendant undoubtedly has been unhappy with the ruling by the trial judge that our first opinion, *supra* n. 4, constituted the "law of the case." Aside from the fact that he had no other course open to him, the circumstances clearly required his so concluding. Only in minor respects was the evidence at the second trial different from what had first been presented. Indeed, counsel for the parties had entered into a stipulation concerning facts as to which there was no dispute. While we are quite aware that the principle of "law of the case" is not always necessarily binding, as a rule of practice the doctrine surely was appropriately here applied. The "substantial actual sameness of the two records" justified the ruling by the trial judge, and, acceptably to us. We are dealing with a "case calling imperatively for the application of the doctrine of the law of the case." [10] In view of our holding in our earlier *Elliott* case, and the conclusion reached by the jury upon retrial, the trial judge correctly ruled that Plaintiff had established negligence *per se.*

### B

■ Defendant further contends that the trial judge erroneously instructed the jury that Defendant must bear the burden of demonstrating by a preponderance of the evidence that

since the Defendant violated the regulation, then this evidence establishes proximate cause except or unless you are satisfied from the review of all of the evidence that the preponderance of the evidence is to the contrary with respect to the proximate cause.

In view of some of our cases it might be said that Defendant was afforded more leeway than it was entitled to receive. Defendant was given an opportunity to supply evidence

that some explanation other than the locked door satisfactorily accounts for the failure of Darlene Elliott to escape. Now, if this burden is not met, then the violation of the regulation constitutes a proximate cause and that is the end of the matter.

10. *Lincoln National LIfe Insurance Company v. Roosth,* 306 F.2d 110, 112, (CA 5 *en banc* 1962), *cert. denied,* 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963).

Judge Leventhal, almost but not quite, has provided an answer for us. He pointed out in *Bowman v. Redding & Co.*[11] that

Violation of a duty set forth in a . . code of safety provides a basis for a finding not only of negligence but also—when the injury that has in fact occurred is the very kind of harm the regulation was designed to prevent—for a finding of proximate cause.

Judge Leventhal specified further that

proof of a safety violation is itself evidence of proximate cause where the injury is generally of the kind intended to be avoided by the regulation involved. *If that evidence is not rebutted or offset, proximate cause is established as a matter of law.*[12] (Emphasis supplied).

■ The trial judge was fully aware of the applicability of a principle which, in other situations, and in varying degree simply recognizes that where there is a wrongdoer whose conduct has caused harm, he can not escape liability for the damage he has caused on the ground that the wrongful act of a third party contributed to the injury. *Miller v. Union Pacific R. Co.,* 290 U.S. 227, 236, 54 S.Ct. 48, 78 L.Ed. 532 (1933).[13]

Judge Burger when on our court said as much in *Richardson v. Gregory,* 108 U.S. App.D.C. 263, 266, 281 F.2d 626, 629 (1960). There it was observed that where a particular regulatory standard is enacted to protect persons in a plaintiff's position and that plaintiff can establish his relationship to the statute, *"unexplained violation of that standard renders the defendant negligent as a matter of law."* (Emphasis added, citations omitted).

Here we come full circle as we return to Judge Edgerton's observation in *Ross v. Hartman,* 78 U.S.App.D.C. 217, 219, 139 F.2d 14, 16 (1943):

"It [the law] puts the burden of risk . . . upon those who created it . . . it is fairer to hold him responsible for the harm than to deny a remedy to the innocent victim."

Defendant here would have us disregard the balance as struck by our late distinguished colleague, and we refuse to do so.[14] Defendant's cross-appeal will be dismissed.

## PART II

As we earlier noted, Plaintiff had appealed from the rejection by the trial judge of

---

11. *Bowman v. Redding & Co.,* 145 U.S.App. D.C. 294, 301, 449 F.2d 956, 963 (1971).

12. That the general rule must yield to the exigencies of particular situations, depending upon the facts, has long been recognized. A defendant who seeks exculpation from the effects of his own wrong must attempt to establish a predicate for the relief he would have the courts accord to him. Judge Leventhal's point in *Bowman, supra,* did not go unnoticed in *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 287, 464 F.2d 772, 796, *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

As ever so recently we noted, "a showing of negligence by each of two (or more) defendants with uncertainty as to which caused the harm does not defeat recovery but passes the burden to the tortfeasors for each to prove, if he can, that he did not cause the harm." [Fn. 148 citing *Bowman v. Redding & Co.,* 145 U.S.App.D.C. 294, 305, 449 F.2d 956, 967 (1971)]. In the case before us, appellant's evidentiary presentation on negligence survived the claims of legal insufficiency, *and appellees should have been put to their proof.* (Emphasis supplied).

13. And *see Hicks v. United States,* 167 U.S. App.D.C. 169, 182–183, 511 F.2d 407, 420–421 (1975); *Washington Hospital Center v. Butler,*

127 U.S.App.D.C. 379, 386, n. 29, 384 F.2d 331, 339, n. 29 (1967); *compare Huddell v. Levin,* 537 F.2d 726 (CA 3 1976), where at 744 Judge Rosenn cited our *Bowman v. Redding & Co.* case and additionally nodded in the direction of Judge Learned Hand who epitomized "He is a wrongdoer; let him unravel the casuistries resulting from his wrong." *Navigazione Liberta T.S.A. v. Newtown Creek T. Co.,* 98 F.2d 694, 697 (CA 2, 1938).

We have recognized the *Miller* principle in several situations, with discussion and direct quotation therefrom in *Hicks v. United States, supra,* and in other cases there cited. Of course, Cobb could have been named a codefendant with Michael James, Inc.

14. Defendant has insisted that somehow *Hecht Co. v. McLaughlin,* 93 U.S.App.D.C. 382, 214 F.2d 212 (1954), had enlarged the area within which Defendant might attempt to parry our reliance upon the violation of the building code as predicating negligence *per se.* Here, however, unlike the regulation considered in *Hecht,* there was no ambiguity whatever and hence no need for evidentiary explanation. *See H.R.H. Construction Corp. v. Conroy,* 134 U.S.App. D.C. 7, 9, n. 15, 411 F.2d 722, 724, n. 15 (1969).

Plaintiff's wrongful death claim. Respective counsel had tried the case throughout on both counts. When Plaintiff rested, Defendant had moved for a directed verdict relying upon grounds which have been considered in Part I, *supra*. Ruling adversely to Defendant, the trial judge announced, "I find as a matter of law the regulation was violated." Presently, and apparently on his own initiative, the trial judge further informed counsel:

> THE COURT: I have a problem with the case which is of a different kind, gentlemen, and I want to mention it to you.
>
> I don't see any wrongful death case here. I see a survival action but I don't see any proof of wrongful death.
>
> \*   \*   \*   \*   \*   \*
>
> The wrongful death claim would be a death claim of the present value of Darlene's services to her mother. There is no testimony of the present value of those services.

**15.** It may prove helpful to refer to Defendant's brief where, succinctly, *Defendant* told us:

> In an effort to prove her damages, the plaintiff called as an expert witness Dr. Richard Lurito, an economist. Dr. Lurito using numerous statistics and tables computed the net amount of money Darlene Elliott, had she lived, would most likely have made during her lifetime and reduced it to present value. Again, based on various tables, the facts presented to him and his own expertise, he assumed that Darlene Elliott would marry and spend approximately 20% of her net *income on her own personal maintenance.* (App. 126). The remaining 80% of her net income, Dr. Lurito testified, would be spent on expenditures for her children and her husband with, perhaps, some left over in her estate as savings. (App. 131, 134–136).

**16.** The judge explained that his proposal would greatly simplify the instruction problem and that from a money point of view, it would make no difference. Counsel agreed, and thus it was established Mrs. Elliott had paid funeral expenses in the amount of some $2900. Accordingly, that amount was included when the jury returned its verdict awarding $7,524.91 on the Survival count.

Of course, duplicate recovery for the same harm is to be avoided. The beneficiaries under the Survival count, for example, would here have included Darlene's divorced father and such beneficiaries are not necessarily the same

It is clear from the record that the judge deemed Plaintiff's claim to be "entirely speculative," and he continued:

> If there had been any computations with respect to the wrongful death, it would have to have been deducted from all these other figures which the expert has placed in on the survival.[15]

The judge realized that the District's Wrongful Death Statute, *supra* note 1, provides that if damages were to be allowed, the assessment was to include funeral expenses. The judge proposed and counsel agreed that if there were to be an award on the survival claim, the judge would

> include in the instructions that that is an additional sum to be awarded under the survival action. Then *if there is an award* for the funeral services to the estate, the estate can recompense Mrs. Elliott *for those funeral expenses.*[16] (Emphasis added).

Although Plaintiff's counsel argued further the bases[17] upon which Plaintiff

as those entitled to recover under the Wrongful Death count. Here the plaintiff's mother became the beneficiary under the Wrongful Death count. Upon the retrial on the Wrongful Death count to be discussed *infra,* the parties undoubtedly can agree because of the peculiar circumstances here that the judge shall instruct that the jury is to make no award for funeral expenses, since it was agreed that Mrs. Elliott is to be reimbursed anyhow, as our trial judge proposed, *supra.*

**17.** It will be remembered that Plaintiff had offered supporting evidence on both counts of her complaint. Following Darlene Elliott's graduation from high school she had been employed as a "Kelly Girl," as a dental assistant, and in yet other positions, each change resulting in higher salaries. For example, in the first four months of 1968 she had earned $2,145.26. Described as an attractive young woman who had won local beauty contests, she attended a Modeling Academy and often served as a model in fashion promotional programs. Then, in May 1968, she became a trainee bookkeeper employed by Michael James, Inc., scheduled for service in Baltimore. She was living with her mother in Baltimore, contributing $50 per week as she shared living expenses with Plaintiff, but was temporarily, to save commuting, living with her sister in the District. There was evidence that mother and daughter enjoyed a close, warm relationship. There was evidence that *the mother had long assisted in caring for*

should be entitled to go to the jury on the wrongful death claim, the trial judge ruled "I will present this to the jury only as a survival action."

The courts here in the District of Columbia have often considered problems arising under the District's Wrongful Death Statute, *supra* note 1. There have been many situations where reduction of pecuniary loss to a dollar figure simply is not possible. Consider, *e. g., Rankin v. Shayne Brothers, Inc.,* 98 U.S.App.D.C. 214, 215, 234 F.2d 35, 36 (1956), where Judge Fahy wrote, quoting from and approving an instruction by the trial judge:

> "The amount of damages to be awarded must be based largely on the good sense and sound judgment of the jury, because this amount cannot be computed by any mathematical formula, and the amount must be based upon all the facts and circumstances of the case involving such matters as the age of the child at the time of its death; the age and financial standing of the parents, the life expectancy of the child and of the parents under the mortality tables as of the date of the child's death, and similar considerations."

*See,* also, in greater detail *Runyon v. District of Columbia,* 150 U.S.App.D.C. 228, 231, 463 F.2d 1319, 1323 (1972). That opinion explained that pecuniary loss to an estate under our Survival Statute does not coincide with the pecuniary loss to those entitled to recovery under the Wrongful Death Act. *Runyon* further pointed out, 150 U.S.App.D.C. at 232, 463 F.2d at 1323, that loss to a mother, as here, "is represented by the loss of a source of maintenance for such things as food, clothing, shelter, educational expenses, and the like." [18]

her own invalid father thus affording an example to Darlene Elliott of dutiful family living. The trial judge, over Plaintiff's objection, curtailed proffered further evidence in this respect. Plaintiff's counsel argued that there thus had been afforded a reasonable basis for an expectancy by the mother that she could count upon Darlene to render assistance if needed.

**18.** Judge Youngdahl recognized that "pecuniary loss" in a wrongful death case can be viewed as speculative, *Hankins v. Southern*

Even though some of our opinions have spoken of Wrongful Death Act damages as representing "pecuniary" loss to the beneficiary, we are quite aware that a dollar "amount cannot be computed by any mathematical formula," *Rankin v. Shayne Brothers, Inc.,* 98 U.S.App.D.C. 214 at 215, 234 F.2d at 36. Perhaps none of our cases had delineated the problem more accurately than did Judge Holtzoff in *Hord v. National Homeopathic Hospital,* 102 F.Supp. 792, 794 (D.D.C.1952). There he noted that no compensation is permitted for grief, mental anguish, or sentimental loss. The purpose of that restriction, he explained, was to confine the amount of damages within reasonable bounds and to prevent improvident and extravagant awards. That limitation, he added,

> . . . must not be used to defeat the humanitarian objective of the statutes and to limit recovery to nominal damages. The pecuniary loss resulting from the death of a member of the family cannot be ascertained with precision or computed with accuracy. True, in the case of an adult, the income of the deceased and his earning capacity form a partial basis for a conclusion. Even in such a situation, however, an element of chance and conjecture enters into the determination, because if the deceased had not lost his life as a result of the defendant's negligence, he might have died shortly thereafter in another accident or from some natural cause. For this reason mortality tables furnish some guide even though they are based entirely on averages.

We affirmed, *National Homeopathic Hospital v. Hord,* 92 U.S.App.D.C. 204, 205, 204 F.2d 397, 398 (1953).

*Foundation Corp.,* 216 F.Supp. 554, 558 (D.D.C. 1963). We affirmed, 117 U.S.App.D.C. 150, 326 F.2d 693 (1963).

As the statute permits, *supra* note 1, the court is not deprived of control if it be determined that a verdict is contrary to the evidence for the judge can order judgment N.O.V. The "wise course" is to allow the case to go to the jury, we said in *Peigh v. Baltimore and O.R.R. Co.,* 92 U.S.App.D.C. 198, 202, 204 F.2d 391, 396 (1953).

Judge Holtzoff's reasoning led him to the conclusion that the law does not differentiate between the death of an adult and the death of an infant, and so "the general rule is that substantial damages should be awarded in any death case in which the plaintiff prevails, irrespective of the age of the deceased." Outlining factors to be considered and which may aid in the ascertainment of damages, he noted "the possibility that the child may make contributions to the support of his parents even after he reaches majority," *Id.,* 102 F.Supp. at 794. There he also said that the "method of ascertaining damages is, no doubt, artificial and unrealistic"

> but it is a rule that the law has formulated in order to afford a substantial recovery without allowing license for extravagant verdicts for grief and injury to feelings. Naturally, much must be left to the wise discretion and sound judgment of the jury, since the amount of damages is not subject to mathematical calculation. This is true, however, in most tort cases.

■ We have said enough to illustrate our conclusion that the trial judge here had erred in taking Plaintiff's Wrongful Death claim from the jury. His view that definite dollar values be established with reference to the factors entering into a verdict went beyond the requirements of the proof upon which the good sense and sound judgment of the jury were to operate.[19]

## CONCLUSION

In other situations where the courts have seen error in the ascertainment of appropriate damages, liability having been established as was clearly the case here, a remand has been ordered limited solely to the issue of damages. *See, e. g., Hudson v. Lazarus,* 95 U.S.App.D.C. 16, 23, 217 F.2d 344, 354 (1954), *Washington Gaslight Co. v. Connolly,* 94 U.S.App.D.C. 156, 159, 214 F.2d 254, 256 (1954), and *cf. D'Ambra v. United States,* 481 F.2d 14, 21 (CA 1, 1973), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1974). We will follow that course here. We will affirm the award and judgment in the Survival Action, and remand for a hearing in damages conformably with this opinion, on the Wrongful Death count.

Let our order be drawn accordingly.

McGOWAN, Circuit Judge, concurring in part, and dissenting in part:

I concur in Judge Danaher's opinion for the court insofar as it relates to the claim based upon the wrongful death statute. I

---

**19.** *See generally Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), where the majority opinion dealt with the measure of damages in a maritime wrongful death action. Drawing upon the body of law which has been evolving in state court actions providing for damages under state wrongful death statutes, the Court's discussion, 414 U.S. 585–591, 94 S.Ct. 806 and accompanying footnotes, may be deemed helpful as we contemplate our own problem. Importantly, in light of this court's opinions, such as *Rankin v. Shayne Brothers, Inc., supra, Runyon v. District of Columbia, supra,* and *Hord v. National Homeopathic Hospital, supra; see Sea-Land Services, Inc. v. Gaudet,* 414 U.S. at 590, 94 S.Ct. at 817, where the majority wrote that insistence upon "mathematical precision would be illusory and the judge or juror must be allowed a fair latitude to make reasonable approximations guided by judgment and practical experience," citing pertinent cases.

Granting the lack of "precision" as to specific elements of "pecuniary" loss, our jurisdiction as will be discerned from discussion in our cases as cited, *supra,* has not taken a narrow view in allowing recovery. Our trial judges on the firing line are quite aware, as Judge Holtzoff put it, *supra,* that a "substantial recovery" may be permitted without allowing for "extravagant verdicts," indeed our statute, note 1 *supra,* prescribes as much. Judge Youngdahl in *Hankins, supra* note 18, thought of the award as "highly speculative in any event."

We have not been confronted simply with the element of "loss of society," *Sea-Land Services, Inc. v. Gaudet, supra,* 414 U.S. at 587, *and see, id.,* 587, note 21, and *id.,* 585 and note 12, 94 S.Ct. 806. Even though a few states may have permitted recovery for the pecuniary value of the loss of decedent's "society," we have not so ruled. A controversial result in *Sea-Land Services, Inc.,* need not detain us. *Compare* the dissent, *Sea-Land Services, Inc.,* 414 U.S. at 595, 94 S.Ct. 806, *et seq., rehearing denied,* 415 U.S. 986, 94 S.Ct. 1582, 39 L.Ed.2d 883 (1974). After all, Sea-Land Services, Inc., involved issues as to permissible recovery for wrongful death under federal legislation, as the divided court made clear.

768

do not join in either the reasoning or the result reached in Part I of the opinion dealing with cross-appellant's contention that the burden of proof was not allocated properly.

This court has said that proof of a safety code violation can provide a basis for a finding of not only negligence but also proximate cause as to a victim who has been held to fall within the protection of the code. *See Bowman v. Redding & Co.,* 145 U.S.App.D.C. 294, 449 F.2d 956, 963 (1971). But this court has also made plain (at 449 F.2d at 964), that what this means is that the plaintiff's burden of proof can be carried as a matter of law *unless* the defendant adduces evidence which tends to offset or rebut the existence of proximate cause. The evidence in this record is such as to create, in my view, a sufficient degree of offset ·or rebuttal. The question then normally becomes one for the jury, instructed properly that the burden ·of proving proximate cause by a preponderance of the evidence still rests upon the ·plaintiff. In the case before us, in which no special circumstances justify departing from the general rule, the jury appears to have been instructed that the burden of proof rests on defendants.